**In the Matter of a Member of the Bar of the Supreme Court of the State of Delaware:**

**I. Jay KATZ.**

**No. 442, 2009.**

Supreme Court of Delaware.

Submitted: Aug. 24, 2009.
Decided: Sept. 24, 2009.

Charles Slanina, Esquire, Finger & Slanina, LLC, Hockessin, Delaware, for respondent, I. Jay Katz.

Michael S. McGinniss, Esquire, Office of Disciplinary Counsel, Wilmington, Delaware.

Before STEELE, Chief Justice, HOLLAND and BERGER, Justices.

PER CURIAM.

This is a lawyer disciplinary proceeding. A Petition for Discipline was filed on April 1, 2009, in Case No.2008–0587–B (the "Petition") involving I. Jay Katz, Esquire (the "Respondent"). The Petition alleged that the Respondent engaged in professional

misconduct in violation of Rule 1.1 (two counts), 1.4(b) (two counts), 1.7 (one count) and 1.16(a) (Interpretive Guideline Re: Residential real estate transactions) (one count) of the Delaware Lawyers' Rules of Professional Conduct (the "Rules").

In the proceedings before the Board on Professional Responsibility (the "Board"), the Office of Disciplinary Counsel (the "ODC") and the Respondent submitted a Pre–Hearing Stipulation of Admitted Facts and Violations (the "Stipulation"). The Stipulation was signed by Michael S. McGinniss, Esquire, Disciplinary Counsel of the ODC, and by Charles Slanina, Esquire, counsel for the Respondent, and included a Certification by the Respondent admitting the facts and violations of the Rules alleged in the Petition, although the Respondent also asserted additional facts by way of "further answer" with respect to the allegations of the Petition involving violations of Rule 1.16(a), Interpretive Guidelines re: Residential real estate transactions.

On August 5, 2009, the Board filed a report with this Court. The Board recommended that the Respondent be publicly reprimanded and placed on a period of probation for one year, with the imposition of specific conditions. Neither the Office of Disciplinary Counsel nor the Respondent has filed any objections to the Board's report.

This Court has considered the matter carefully. We have concluded that instead of a public reprimand, the Respondent should be suspended from practicing law for three months. We agree with the Board's recommendation of a one-year period of probation with conditions. That probationary period will begin after the Respondent has been reinstated following his suspension.

*Facts*

The Stipulation set forth the following admitted facts:

1. The Respondent is a member of the Bar of the Supreme Court of Delaware. He was admitted to the Bar in 2004. At all times relevant to this Petition for Discipline, the Respondent has been engaged in the private practice of law in Delaware as a solo practitioner.

2. In 2005 and 2006, the Respondent had an attorney-client relationship with Mr. Robert G. Lubach ("Lubach"), which included the preparation of loan documents for his use as a lender making loans to individual borrowers, secured by mortgages on their Delaware residential real property.

A. *Cross*

3. In April 2005, Arthur Wayne Cross ("Cross") met with the Respondent to discuss his significant debt problems, which had created a concern that he and his partner, John G. Smith ("Smith"), could lose their home to foreclosure. Cross and Smith retained the Respondent's legal services to help them address those debt problems and to provide them with legal advice and services concerning their estate planning.

4. In October 2005, the Respondent referred Cross to Lubach for the purpose of obtaining a loan. Thereafter, the Respondent performed closings for at least four loans from Lubach to Cross (the "Cross Loans"). The dates of these closings were on or about November 2, 2005; November 15, 2005; March 1, 2006; and August 22, 2006.

5. On or about November 2, 2005, Cross signed the closing documents prepared and/or finalized for closing by the Respondent for a loan from Lubach in the principal amount of $80,000. The note for

this loan was secured by a mortgage on Cross' residential real property located in Wilmington, Delaware.

6. The Respondent's file includes a document entitled "Statement of Representation and Disclosure/Arther [sic] Wayne Cross," dated November 2, 2005. Although the document includes a line with the Respondent's name and for the Respondent's signature, the document is unsigned. This document states, in part, as follows:

> I acknowledge that you have chosen this office to handle the above referenced loan and mortgage. Our fee in this matter is _____ to be collected from the loan proceeds.... Under the Delaware Lawyers Code of Professional Responsibility, Rule 1.16, Interpretive Guidelines Regarding Residential Real Estate Transactions, in the event that a seller, lender, real estate agent or other person having an interest in this transaction referred you to me, there are several applicable disclosures you should be aware of prior to our accepting representation of you. In this case, I referred you to a private lender, Robert Lubach.

7. The unsigned November 2, 2005, "Statement of Representation and Disclosure" also states as follows:

> 1. You have the absolute right to choose your own attorney to represent you throughout the transaction regardless of any preference a seller, real estate agent, lender or other person may have or referral they may make.
>
> 2. We are required to tell you ... whether or not we represent any other party having an interest in the transaction that could create a possible conflict of interest. Such a conflict could adversely affect the exercise of our professional judgment on your behalf in case of a dispute between the parties. A potential conflict of interest could arise as a result of our representation of the seller, the real estate agent or the lender in this transaction, or on a continuing basis in the past. In this case, we have represented Robert Lubach in this transaction and in other transactions.
>
> 3. Since we represent a lender, Robert Lubach, who in connection with this transaction will take back a promissory note and mortgage, we certify to the lender that its mortgage will be a second lien on your property and to the extent that we are meeting the other requirements of the lender before we are permitted to disburse the loan proceeds. We have and/or in the future represented the lender in that respect in other residential real estate transactions in the past. Other than the lender, we do not represent any other party other than you in this transaction.

8. The Respondent did not obtain informed consent from Cross, confirmed in writing, to represent him in connection with the November 2, 2005, loan transaction notwithstanding the Respondent's concurrent representation of the lender, Lubach. By way of further explanation, the Respondent attempted to obtain the informed written consent of Cross for the representation by preparing the unsigned "Statement of Representation and Disclosure." However, the Respondent has been unable to locate a signed copy of this document. Cross would testify that he neither recalls receiving it nor does he have a copy of it in his records.

9. On or about November 15, 2005, Cross signed closing documents prepared and/or finalized for closing by the Respondent, in the aggregate principal amount of the two loans to date ($195,000). The note for this loan was secured by a mortgage on Cross' residential real property located in Wilmington, Delaware.

10. The Respondent's file includes an unsigned document entitled "Statement of Representation and Disclosure/Arther [sic] Wayne Cross," dated November 15, 2005. The substance of this document is identical to the unsigned "Statement of Representation and Disclosure" dated November 2, 2005.

11. The Respondent did not obtain informed consent from Cross, confirmed in writing, to represent him in connection with the November 15, 2005, real estate loan transaction notwithstanding the Respondent's concurrent representation of the Lender, Lubach. By way of further explanation, the Respondent attempted to obtain the informed written consent of Cross for the representation by preparing the unsigned "Statement of Representation and Disclosure." However, the Respondent has been unable to locate a signed copy of this document. Cross would testify that he neither recalls receiving this document nor does he have a copy of it in his records.

12. On or about March 1, 2006, Cross signed closing documents prepared and/or finalized for closing by the Respondent for another loan from Lubach, in the principal amount of $58,300. The note for this loan was secured by a mortgage on Cross' residential real property located in Wilmington, Delaware.

13. The Respondent did not obtain informed consent from Cross, confirmed in writing, to represent him in connection with the March 1, 2006, loan transaction notwithstanding the Respondent's concurrent representation of the lender, Lubach. By way of further explanation, the Respondent states that he attempted to obtain the informed written consent of Cross for the representation. However, the Respondent has been unable to locate either a signed or an unsigned copy of a "Statement of Representation and Disclosure" for the March 1, 2006, transaction. Cross would testify that he neither recalls receiving this document nor does he have a copy of it in his records.

14. On or about August 22, 2006, Cross signed closing documents prepared and/or finalized for closing by the Respondent for another loan from Lubach, in the principal amount of $68,300. The note for this loan was secured by a mortgage on Cross' residential real property located in Wilmington, Delaware. That loan and that amount included the $58,300 represented in the March 1, 2006, loan referenced in paragraph 12.

15. The Respondent's file includes an unsigned document entitled "Statement of Representation and Disclosure/Arther [sic] Wayne Cross," dated September 1, 2006. The substance of this document is identical to the unsigned "Statement of Representation and Disclosure" dated November 2, 2005.

16. The Respondent did not obtain informed consent from Cross, confirmed in writing, to represent him in connection with the August 22, 2006, loan transaction notwithstanding the Respondent's concurrent representation of the lender, Lubach. By way of further explanation, the Respondent attempted to obtain the informed written consent of Cross for the representation by preparing the unsigned "Statement of Representation and Disclosure." However, the Respondent has been unable to locate a signed copy of this document. Cross would testify that he neither recalls receiving this document nor does he have a copy of it in his records.

17. For each of the four Cross Loans, the Respondent prepared and/or finalized for closing, notes which contained payment provisions—such as pre-payment penalties (all except the November 15, 2005, loan), balloon payments (all four loans), and pre-

paid payment (March 1, 2006)—prohibited by federal law.[1] The Respondent does not contest that these notes unintentionally violated federal law.

18. For each of the Cross Loans, the lender failed to provide a "right to rescind" notice to Cross about his right to rescind the loan transaction within three days after the closing.[2] The Respondent failed to provide Cross with legal advice about his "right to rescind."

## B. *Other Lubach Loan Transactions*

### 1. *Brewer*

19. On or about March 13, 2006, Lubach referred Mr. Timothy S. Brewer and Mrs. Michele A. Brewer (the "Brewers") to the Respondent for assistance in closing a loan from Lubach.

20. On or about March 18, 2006, the Brewers signed closing documents prepared and/or finalized for closing by the Respondent for a loan from Lubach, in the principal amount of $20,922 (the "Brewer Loan"). The note was secured by a mortgage on the Brewers' residential real property located in Clayton, Delaware. The Respondent performed the closing for the Brewer Loan.

21. The Respondent's file includes a document entitled "Statement of Representation and Disclosure/Timothy S. Brewer and Michele S. Brewer," dated March 13, 2006. The substance of this document is identical to the "Statement of Representation and Disclosure" included in the Respondent's file for the November 2 and 15, 2005, Cross Loans, except that (1) it includes the amount of the Respondent's fee, to be collected from the loan proceeds; (2)

it states that "[i]n this case, you were referred to me by a private lender, Robert Lubach"; and (3) it is signed by the Respondent.

22. The Respondent did not provide the March 13, 2006, "Statement of Representation and Disclosure" to the Brewers in advance of the March 18, 2006, closing. By way of explanation, the Respondent states that because settlement occurred within days of the referral and took place on a Saturday, the "Statement of Representation and Disclosure" was provided to the Brewers at settlement.

23. The Respondent charged attorney's fees to the Brewers for legal services relating to the Brewer Loan, which he collected from the loan proceeds.

24. The Respondent prepared and/or finalized for closing a note for the Brewer Loan which included payment provisions (*i.e.,* pre-payment penalty and balloon payment) prohibited by federal law.[3] The Respondent does not contest that this note unintentionally violated federal law.

25. The lender failed to provide a "right to rescind" notice to the Brewers about their right to rescind the loan transaction within three days after the closing.[4] The Respondent failed to provide the Brewers with legal advice about their "right to rescind."

### 2. *Bruce*

26. Lubach referred Mr. Lance W. Bruce and Ms. Maria A. Bruce (the "Bruces") to the Respondent for assistance in closing a loan from Lubach.

---

1. *See* 15 U.S.C. §§ 1602(aa), 1639; 12 C.F.R. §§ 226.31–.32.

2. *See* 15 U.S.C. § 1635; 12 C.F.R. §§ 226.33, .31, .32.

3. *See* 15 U.S.C. §§ 1602(aa), 1639; 12 C.F.R. §§ 226.31–.32.

4. *See* 15 U.S.C. § 1635; 12 C.F.R. §§ 226.23, .31, .32.

27. On or about November 27, 2006, the Bruces signed closing documents prepared by the Respondent for a loan from Lubach, in the principal amount of $11,000 (the "Bruce Loan"). The note was secured by a mortgage on the Bruces' residential real property located in Wilmington, Delaware. The Respondent performed the closing for the Bruce Loan.

28. The Respondent's file includes a document entitled "Statement of Representation and Disclosure/Lance W. Bruce and Maria A. Bruce," dated November 20, 2006. The substance of this document is identical to the "Statement of Representation and Disclosure" included in the Respondent's file for the November 2 and 15, 2005, Cross Loans, except that (1) it includes the amount of the Respondent's fee, to be collected from the loan proceeds; (2) it states that "[i]n this case, you were referred to me by a private lender, Robert Lubach"; and (3) it is signed by the Respondent.

29. The Respondent did not provide the November 20, 2006, "Statement of Representation and Disclosure" to the Bruces in advance of the November 27, 2006, closing. By way of explanation, the Respondent states that because settlement occurred within days of the referral, the "Statement of Representation and Disclosure" was provided to the Bruces at settlement.

30. The Respondent charged attorney's fees to the Bruces for legal services relating to the Bruce Loan, which he collected from the loan proceeds.

31. The Respondent prepared and/or finalized for closing a note for the Bruce Loan which included payment provisions (i.e., pre-payment penalty and balloon payment) prohibited by federal law.[5] The Re-

spondent does not contest that this note unintentionally violated federal law.

32. The lender failed to provide a "right to rescind" notice to the Bruces about their right to rescind the loan transaction within three days after the closing.[6] The Respondent failed to provide the Bruces with legal advice about their "right to rescind."

### 3. *Bazemore*

33. Lubach referred Ms. Karlo Bazemore ("Bazemore") to the Respondent for assistance in closing a loan from Lubach.

34. On or about June 13, 2006, Bazemore signed closing documents prepared by the Respondent for a loan from Lubach, in the principal amount of $16,500 (the "Bazemore Loan"). The note was secured by a mortgage on Bazemore's residential real property located in Newark, Delaware. The Respondent performed the closing for the Bazemore Loan.

35. The Respondent's file includes a document entitled "Statement of Representation and Disclosure/Karlo Bazemore," dated June 5, 2006. The substance of this document is identical to the "Statement of Representation and Disclosure" included in the Respondent's file for the November 2 and 15, 2005, Cross Loans, except that (1) it includes the amount of the Respondent's fee, to be collected from the loan proceeds; (2) it states that "[i]n this case, you were referred to me by a private lender, Robert Lubach"; and (3) it is signed by the Respondent.

36. The Respondent did not provide the June 5, 2006, "Statement of Representation and Disclosure" to Bazemore in advance of the June 13, 2006, closing. By way of explanation, the Respondent states

---

5. *See* 15 U.S.C. §§ 1602(aa), 1639; 12 C.F.R. §§ 226.31–.32.

6. *See* 15 U.S.C. § 1635; 12 C.F.R. §§ 226.23, .31, .32.

that because settlement occurred within days of the referral, the "Statement of Representation and Disclosure" was provided to Bazemore at settlement.

37. The Respondent charged attorney's fees to Bazemore for legal services relating to the Bazemore Loan, which he collected from the loan proceeds.

38. The Respondent prepared and/or finalized for closing a note for the Bazemore Loan which included payment provisions (*i.e.*, pre-payment penalty and balloon payment) prohibited by federal law.[7] The Respondent does not contest that note unintentionally violated federal law.

39. The lender failed to provide a "right to rescind" notice to Bazemore about her right to rescind the loan transaction within three days after the closing.[8] The Respondent failed to provide Bazemore with legal advice about her "right to rescind."

### *Ethical Rules Violations*

As a result of the admissions in the Stipulation, the Board found that the Respondent had violated the following ethical rules:

1. **Rule 1.1** requires that a "lawyer shall provide competent representation to a client."

2. By failing to provide competent representation to Cross in each of his loan transactions with Lubach, including by (1) preparing and/or finalizing for closing note with payment provisions that violated federal law regulating consumer loan practices, and (2) failing to provide Cross with legal advice concerning his legal rights to rescind the loan transactions within three days after closing, the Respondent violated **Rule 1.1**.

3. By failing to provide competent representation to the Brewers, the Bruces, and Bazemore in their loan transactions with Lubach, including by (1) preparing and/or finalizing for closing note with payment provisions that violated federal law regulating consumer loan practices, and (2) failing to provide these clients with legal advice concerning his rights to rescind the loan transactions within three days after closing, the Respondent violated **Rule 1.1**.

4. **Rule 1.4(b)** requires that a "lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."

5. By failing to explain matters to Cross to the extent reasonably necessary to permit him to make informed decisions regarding the representation, including by (1) failing to explain to Cross that he was signing a note with payment provisions that violated federal law regulating consumer loan practices, and (2) failing to provide Cross with legal advice concerning his right to rescind the loan transactions within three days after closing, the Respondent violated **Rule 1.4(b)**.

6. **Rule 1.7(a)** states, in part, that "[e]xcept as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if: ... (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client ... or by a personal interest of the lawyer."

7. **Rule 1.7(b)** states that "[n]otwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if: (1) the

---

7. *See* 15 U.S.C. §§ 1602(aa), 1639; 12 C.F.R. §§ 226.31–.32.

8. *See* U.S.C. § 1635; 12 C.F.R. §§ 226.23, .31, .32.

lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client; (2) the representation is not prohibited by law; (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and (4) each affected client gives informed consent, confirmed in writing."

8. By representing Cross in loan transactions in which another client (Lubach) was the lender and without having obtained Cross' informed consent, confirmed in writing, to the concurrent representation involved in the arrangement, the Respondent violated **Rule 1.7(a) and (b).**

9. **Rule 1.16(a)** states, in part, that "a lawyer shall not represent a client ... if: (1) the representation will result in violation of the rules of professional conduct or other law."

10. **Rule 1.16** Interpretive Guideline Re: Residential real estate transactions states, in part, as follows:

(a) **Before accepting representation** of a buyer or mortgagor of residential property ..., upon referral by the seller, lender, real estate agent, or other person having an interest in the transaction, it is the ethical duty of a lawyer to inform the buyer or mortgagor **in writing** at the earliest practicable time:

(1) That the buyer or mortgagor has the absolute right (regardless of any preference of the seller, lender, real estate agent, or other person may have and regardless of who is to pay attorney's fees) to retain a lawyer of his own choice to represent him throughout the transaction, including the examination and certification of title, the preparation of documents, and the holding of settlement; and

(2) As to the identity of any other party having an interest in the transaction whom the lawyer may represent, including a statement that such other representation may be possibly conflicting and may adversely affect the exercise of the lawyer's professional judgment on behalf of the buyer or mortgagor in case of a dispute between the parties. For the purpose of this Guideline, a lawyer shall be deemed to have a "possibly conflicting" representation if he ... represents the lender or has represented the lender on a continuing basis in the past.

11. The Guideline further states that "(b) [u]nless the lawyer has been freely and voluntarily selected by the buyer or mortgagor after he has made to the buyer or mortgagor the statements and disclosures hereinabove required, the lawyer may not ethically: (1)[c]ertify, report, or represent for any purpose that the buyer or mortgagor is his client, or that the buyer or mortgagor is or was obligated for any legal service rendered by him in the transaction; or (2)[p]articipate in causing the buyer or mortgagor, directly or indirectly, to bear any charge for his legal service ... (c) The information supplied to the buyer or mortgagor in writing shall contain a description of the attorney's interest or interests sufficient to enable the buyer or mortgagor to determine whether he should obtain a different attorney."

12. By failing to notify the Brewers, the Bruces, and Bazemore in writing at the earliest practicable time (1) of their absolute right to retain an attorney of their choice, and (2) as to his concurrent representation of the lender, Lubach, in their loan transactions, including a statement that such other representation may be possibly conflicting and may adversely affect the exercise of his professional judgment on their behalf, and by charging

attorney's fees for his legal services in their loan transactions under the circumstances, the Respondent violated **Rule 1.16(a), Interpretive Guideline Re: Residential real estate transactions.** By way of explanation, the Respondent states that he took steps to provide the required disclosures. However, he does not contest that providing the disclosures at settlement notwithstanding the fact that the settlements occurred within five to eight days of having been referred to him by the lender and scheduled, did not provide the clients adequate notice or opportunity to act on the disclosures under the circumstances.

### Board Recommended Sanctions

The ODC and the Respondent could not agree on the appropriate sanction to be imposed in this matter. The ODC asserted that the appropriate sanction in this matter is a public reprimand and payment of costs of the disciplinary proceedings under Rule 27 of the Delaware Lawyers' Rules of Disciplinary Procedure. The Respondent maintained that the imposition of a private admonition would be consistent with the Rules, the ABA Standards for Imposing Lawyer Sanctions (1991 & Supp. 1992) (the "ABA Standards") and relevant legal precedents.

The Board disagreed with both the ODC and the Respondent and recommends the imposition of the following sanction:

**The Respondent shall:**

1. Be publicly reprimanded for his violations of Rules 1.1, 1.4(b), 1.7, 1.16(a) and 1.16 Interpretive Guidelines Re: Residential real estate transactions;

2. Be placed on probation for a period of one (1) year, during which time the following conditions shall be imposed:

(a) Within the first 90–days of the probationary period, the Respondent shall attend a DSBA-sponsored or otherwise recognized CLE program directed to the ethical issue of conflicts of interest.

(b) The Respondent shall subject himself to, and cooperate with, conditions established by a practice monitor. The Respondent shall cooperate with the practice monitor to assure that the Respondent meets all obligations owed to clients under Rules 1. 1, 1.7 and 1.16.

(c) The Respondent and his practice monitor shall provide a written report to the ODC every three months during the period of probation, confirming the Respondent's compliance with the terms of his probation and his level of adherence to his obligations under Rules 1. 1, 1.4, 1.7 and 1.16.

(d) During the period of probation, the Respondent shall cooperate in the expedited handling of any subsequent disciplinary matters, with the understanding that any further violation of the Rules or any violation of the terms of the probation may be sufficient for reconsideration and escalation of the sanctions imposed; and

3. Pay the costs of the disciplinary proceedings.

### Rationale for Board Recommended Sanctions [9]

■ In making its recommendation, the Board utilized the four-part framework set forth in the ABA Standards as required in

9. This portion of the Opinion is taken substantially from the Board's Report to this Court.

*In re Steiner.*[10] A preliminary determination of the appropriate sanction is made by assessing the first three prongs of the test: (1) the ethical duty violated; (2) the lawyer's state of mind; and (3) the actual or potential injury caused by the lawyer's misconduct.[11] (4) Once the preliminary determination is made, the fourth prong addresses whether an increase or decrease in the preliminarily determined sanction is justified because of the presence of mitigating or aggravating factors.[12]

The Board's application of these elements to the facts of this case was as follows:

### 1.   The Ethical Duties Violated.

ODC and Respondent stipulated and the Board determined that the Respondent committed misconduct in violation of Rule 1.1 (a "lawyer shall provide competent representation to a client"), Rule 1.4(b) (a "lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation"), Rule 1.7(a) ("[e]xcept as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if: ... (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client ... or by a personal interest of the lawyer."), Rule 1.7(b) ("[n]otwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if: ... (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client; (2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal: and (4) each affected client gives informed consent, confirmed in writing."); Rule 1.16(a) ("a lawyer shall not represent a client ... if: (1) the representation will result in violation of the rules of professional conduct or other law."); and Rule 1.16 Interpretive Guideline Re: Residential real estate transactions.

### 2.   State of Mind.

With respect to the Respondent's admitted violation of Rules 1.1 and 1.4(b), the Board determined that the Respondent was negligent in failing to adequately research and familiarize himself with federal and state law governing consumer loan practices before representing both borrowers and lenders in consumer loan transactions. In this respect, the Board noted that the Respondent is an experienced practitioner, who had handled real estate closings for commercial lender clients since 2004. At the same time, the Respondent, who intended to concentrate his practice on tax and estate planning matters, also began handling private money lending transactions for Lubach, who was one of the Respondent's tax and estate planning clients.

The Board found that the Respondent was deeply involved in Lubach's private lending business; in fact, the Respondent "developed the loan package for [Lubach]." Despite his prior legal work for both commercial lending clients and private money lenders such as Lubach, the Respondent's lack of knowledge of the relevant laws was troubling to the Board because, for exam-

---

**10.**  *In re Steiner,* 817 A.2d 793, 796 (Del.2003).

**11.**  *Id.*

**12.**  *Id.*

ple, the Respondent testified at the Hearing that he "didn't believe ... that Delaware had usury laws." Unfortunately, the Board concluded the action that the Respondent took to close this knowledge gap was inadequate.

Based upon the testimony he offered on his own behalf, it appeared to the Board that the Respondent did little more than refer back to the loan documents used in settlements he had handled for commercial lenders. The Board determined that the Respondent erroneously concluded, without benefit of research of either federal or state law, that the differences between the Lubach loan terms and those in the other loan documents were permissible because the Lubach loans were "short term loans." The Board concluded that the Respondent appears to have approached these legal engagements with a degree of carelessness wholly inappropriate for a Delaware lawyer or, indeed, any lawyer.

The Board also found that the Respondent was negligent and careless in ensuring that he met the obligations of Rules 1.7(a) and (b), Rule 1.16(a) and Rule 1.16 Interpretative Guideline Re: Residential real estate transactions. It appeared to the Board, from the Respondent's testimony, that the nature of these loans, which often allowed only a few days turn-around, did not allow him time to ensure that critical details such as compliance with ethical obligations were fully and properly addressed. The Respondent's carelessness extended to his failing to leave the settlement table with all of the documentation he was required to maintain. The Board found that the Respondent conceded he was offering no evidence at all purporting to show that he attempted to comply with his ethical obligations in providing required disclosures to Lubach, who was also his client and entitled to the same disclosure required under the Rules for his

borrower clients. The Board concluded that the conflict issue presented by his representation of lenders and borrowers was apparently not of sufficient concern to the Respondent to lead him to ensure that his obligations under Rules 1.7(a) and (b) and Rule 1.16 were met.

The Respondent attempted to characterize his case as a new extension of a Delaware lawyer's ethical obligations. With respect to each of the ethical violations at issue, the Board disagreed with the Respondent's argument that the Petition alleged ethical violations that constituted a new standard for ethical conduct by Delaware lawyers. The Board rejected the Respondent's characterization of the ethical obligations at issue and agreed with the ODC that "there is nothing particularly new or novel about the obligations at issue in this matter." The Board concluded the ethical duties that Respondent admits having violated are basic: know the law about which you are advising clients and protect their interests. It was the judgment of the Board that the Respondent failed in both respects.

3. Actual or Potential Injury.

There is no dispute that all of the clients whose representation by Respondent led to this disciplinary proceeding have sustained injury due to the Respondent's actions in connection with the loan transactions at issue. Each of the borrowers entered into financial transactions that obligated them to repay funds in excess of amounts permitted by federal law, and which failed to provide certain protections (*e.g.*, the right to rescind) required by federal law. The Board noted that while Lubach, as the lender in these transactions, did not engender the same degree of sympathy as the borrowers whose financial circumstances led them to this private money lender, nonetheless the Respon-

dent's admitted lack of knowledge about federal and state consumer lending laws may have harmed the lender, as well. Evidence presented to the Board revealed that Lubach was, at the time of the Hearing, a defendant in a civil action filed by the Attorney General of the State of Delaware seeking damages and other relief for violations of federal consumer credit laws, based upon loans he made (including those at issue in this matter).

The Respondent failed to represent the lender competently, in failing to advise him that the loans he made violated federal consumer credit laws. The Respondent failed to represent the borrowers competently, in failing to advise them of their rights under these same laws. Accordingly, the Board concluded that all of the Respondent's clients in these transactions sustained actual injury.

### Aggravating Factors

The ABA Standards sets forth the following non-exhaustive list of aggravating factors:

(a) prior disciplinary offenses;

(b) dishonest or selfish motive;

(c) a pattern of misconduct;

(d) multiple offenses;

(e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency;

(f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process;

(g) refusal to acknowledge wrongful nature of conduct;

(h) vulnerability of victim;

(i) substantial experience in the practice of law;

(j) indifference to making restitution; and

(k) illegal conduct, including that involving the use of controlled substances.

The ODC argued that ABA Standards 9.22(a), (c) and (i) should be applied. The Respondent suggested that no aggravating factors were applicable to his case. The Board determined that ABA Standards 9.22(a), (c), (h) and (i) all properly apply to the facts of this case. With respect to Standard 9.22(b), the Board noted that the Respondent was paid his legal fee at the time of settlement, from the proceeds of each loan addressed in the Petition. Therefore, it was the Board's view that while this does not alone prove a selfish motive, the fact that the Respondent benefitted financially from each of these unlawful loans cannot be ignored.

In considering ABA Standard 9.22(a), the Board recognized that the Respondent was the recipient of a private reprimand imposed in December 2007, arising from the consolidation of three different disciplinary matters. The Board did not accept the Respondent's argument that his prior disciplinary record should not be used as an aggravating factor on the grounds that he had not yet received this discipline at the time that he engaged in the ethical violations at issue herein. The Board also found that ABA Standard 9.22(c) applies because the prior disciplinary matters (only one disciplinary action was imposed for three different cases), along with the fact that the Petition involves ethical violations in not one, but seven different transactions, constitutes a "pattern of misconduct" or in the words of the ODC, a "history of professional misconduct."

Although ABA Standard 9.22(h) was not raised by ODC, the Board found the Respondent's own testimony was compelling in describing the vulnerability of his borrower clients who were the victim of his ethical misconduct. The Respondent testi-

fied that these borrowers were in "dire financial need," "about to lose their homes" and desperately trying to avoid IRS penalties. Therefore, the Board found that ABA Standard 9.22(h) is a relevant aggravating factor in this case. Finally, the Board found that the Respondent's legal experience justifies the application of ABA Standard 9.22(i). The Respondent was an attorney, first admitted to practice in Delaware in 2004, who earned two advanced degrees in the field of tax law and who taught at both the University of Florida and Widener University School of Law, and who practiced law in Kentucky for seven years before leaving private practice for teaching.

### Mitigating Factors

ABA Standard 9.32 sets forth the following non-exhaustive list of factors to be considered in mitigation:

(a) absence of a prior disciplinary record;

(b) absence of a dishonest or selfish motive;

(c) personal or emotional problems;

(d) timely good faith effort to make restitution or to rectify consequences of misconduct;

(e) full and free disclosure to disciplinary board or cooperative attitude toward proceedings;

(f) inexperience in the practice of law;

(g) character or reputation;

(h) physical disability;

(i) mental disability or chemical dependency including alcoholism or drug abuse when:

(1) there is medical evidence that the Respondent is affected by a chemical dependency or mental disability;

(2) the chemical dependency or mental disability caused the misconduct;

(3) the respondent's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and

(4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely;

(j) delay in disciplinary proceedings;

(k) imposition of other penalties or sanctions;

($l$) remorse; and

(m) remoteness of prior offense.

The ODC and the Respondent agreed that ABA Standard 9.32(b) (absence of a dishonest or selfish motive) and ($l$) (remorse) should apply to this case. They disagreed about the application of ABA Standards 9.32(a) (absence of prior discipline) and (f) (inexperience). The Board disagreed with the Respondent's contention that the private admonition he previously received does not constitute prior disciplinary action under ABA Standard 9.32(a) or that his lack of experience in the practice of real estate law constitutes a mitigating factor under ABA Standard 9.32(f). For the reason set forth in its discussion of aggravating factors, the Board also did not believe it was appropriate to disregard the Respondent's selfish nature by applying ABA Standard 9.32(b) in this case.

In reaching its determination that the appropriate sanction is the imposition of a public reprimand and a period of probation with conditions, the Board considered each of the factors set forth above, as well as the objectives of Delaware's lawyer disciplinary system and the relevant case law. The Board concluded that the degree of negligence exhibited by the Respondent in his handling of the loan transactions at issue here, coupled with the "history of professional misconduct" displayed during the Respondent's relatively short tenure as

a Delaware lawyer and the very real harm suffered by his clients in these transactions, compel a more serious level of discipline than the public reprimand proposed by the ODC. The Board concluded that a public reprimand and probation are the appropriate sanction for the Respondent's commission of "negligent misconduct and careless acts."

## Conflict of Interest

The Respondent's argument that the ethical violations in this proceeding implicate new standards for lawyers is without merit. The Respondent admitted multiple violations of Rule 1.7. Paragraph (a) of Rule 1.7 provides that, "[e]xcept as provided in paragraph (b), a lawyer *shall not* represent a client if the representation involves a *current conflict of interest.*" (emphasis added). Rule 1.7(b)(4) provides that "[n]otwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if: ... *each* affected client gives *informed consent*, confirmed in writing." (emphasis added).

A leading treatise on lawyer ethics by Professors Hazard and Hodes begins its overview on the subject of "conflicts of interest in the practice of law" by noting that "[l]oyalty to clients is one of the core values of the legal profession, perhaps equal in importance with maintaining confidentiality and diligently or zealously working to advance a client's interests."[13] The 1908 Canons of Professional Ethics provided, in part, that "[i]t is unprofessional to represent conflicting interests, except

by express consent of *all* concerned given after a full disclosure of the facts."[14] Accordingly, the Hazard and Hodes treatise concludes "already present in this [1908] formulation are the modern themes that client consent can 'cure' many conflicts of interest but only if it is *informal* [sic] consent."[15]

Since the consequences of making choices in conflict of interest situations are frequently very serious, over the last one hundred years "the legal profession has devoted considerable energy to developing an analytical approach to conflicts of interest issues."[16] Model Rule 1.7 was revised by the ABA in 2002 and adopted by Delaware. That rule continues to set forth the fundamental and venerable principles of the traditional conflicts of interest analysis for lawyers. The only significant substantive change was made in Rule 1.7(b)(4) which requires the informed consent of *each* affected client to be confirmed in writing.

Rule 1.7(a)(2) regulates conflicts of interest that arise when the competing interest is that of another current client in the same matter, even when the matter does not involve litigation. In such circumstances, Rule 1.7 applies to both clients. According to the Hazard and Hodes treatise, "the risk that responsibility to Client B will interfere with the representation of Client A must be assessed, but so must the corresponding risk that Client B will be the one harmed. For the same reason, Rule 1.7(b) would require the informed consent of *both* A and B before the representation could proceed."[17] As we already

---

**13.** 1 Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering* § 10.1:3 (3d ed. Supp.2004).

**14.** ABA Canons of Professional Ethics, Canon 6 (adopted by the ABA on Aug. 27, 1908) (emphasis added).

**15.** 1 Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering* § 10.1:3 (3d ed. Supp.2004).

**16.** *Id.* § 10.2:6.

**17.** 1 Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering* § 11.11:27 (3d ed. Supp.2004) (citation omitted).

stated, Rule 1.7(b) now also requires both of those consents to be confirmed in writing.

■ In applying that example to these proceedings, the lender (Lubach) was the Respondent's Client A and each borrower (Cross, Brewer, Bruce and Bazemore) was a Client B. The Respondent had an ethical obligation to obtain the written informed consent from both the lender and the borrowers in each loan transaction. However, the Respondent never made any attempt to obtain the written informed consent from the lender in any of the loan transactions. The Respondent's attempts to obtain the borrower's consent for each loan transaction were all untimely and uninformed.

The consequences of not having conflict-free legal representation caused injury and potential injury for both the lender and each borrower. Neither the lender nor the borrowers were told that the terms of the loans violated federal law. The borrowers were not told that the implications for mortgaging their residences were so significant they had the right to consider recession for several days before the transactions became final.

### Interpretive Guideline Residual Real Estate Transactions

More than thirty years ago, the Delaware Lawyers' Rules of Professional Conduct were amended to include an Interpretive Guideline outlining principles relating to concurrent conflicts in residential real estate transactions. Like the right of rescission, the Interpretive Guideline is a recognition of the importance that society attaches to a person's residence. It also reflects the historic importance that the legal profession places on either conflict-free representation or an informed waiver of a conflict that has been disclosed in writing in a timely manner.

■ Pursuant to the Interpretive Guideline, a Delaware lawyer's ethical obligation requires *timely* written disclosure of a concurrent conflict *before* the representation is commenced. The written notification must satisfy the requirement that any waiver of the attorney's concurrent conflict is informed. The written disclosure must also provide the borrower or buyer not only with enough time to retain a conflict-free attorney, but also with enough time for that attorney to competently perform the services that are reasonably necessary.

Proper compliance with the Interpretive Guideline requires disclosure of a concurrent conflict of interest in writing at least several days prior to the closing on a residential purchase or a mortgage refinancing. If the borrower or buyer decides to have separate legal representation, after a proper disclosure of the concurrent conflict, it will take time to retain an attorney. It will then take time for that conflict-free attorney to prepare or review the documents and to conduct or review a lien search or a title search. If there are problems with pre-existing liens or the property title is not clear, the conflict-free attorney will need time to resolve those issues. The Respondent admitted repeated violations of Delaware's Interpretive Guideline regarding residential real estate transactions.

### Knowing Violations

■ The Respondent knew that under Rule 1.7 he had a concurrent conflict of interest and also knew of his ethical obligation to comply with Delaware's Interpretive Guideline regarding residential real estate transactions because he prepared written disclosures to the borrowers in every transaction that led to this disciplinary proceeding. In fact, the written disclosures that the Respondent delivered to each borrower (except Cross) at the time

of closing stated, "there are several applicable disclosures you should be award of *prior to our accepting representation* of you." (emphasis added). Nevertheless, the Respondent did not provide those written notifications to the borrower *before* he had already initiated the legal work on their behalf.

The Respondent did not even attempt to provide a timely notice of his concurrent conflict "at the earliest practicable time." Instead, he scheduled each settlement within a few days and only provided written disclosure of his conflict at the closing itself. The Respondent admitted that having the written disclosure of his concurrent conflict delivered to the borrower at the time of the closing was ethically inadequate.

The Respondent's failure to comply with his ethical obligations under Rule 1.7 and the Interpretive Guideline was not an isolated act of either negligence or carelessness. It was ethical misconduct that he repeated over a significant period of time in every loan transaction that led to this disciplinary proceeding. In fact, the Board concluded that the conflict issue presented by his representation of lenders and borrowers was apparently not of sufficient concern to the Respondent to lead him to ensure that his obligations under Rules 1.7(a) and (b) and Rule 1.16 were met.

Accordingly, the Board's conclusion that the Respondent's actions were "negligent misconduct and careless acts" is not supported by the record.[18] The Respondent's ethical misconduct was knowing and caused both actual and potential injury to all of his clients—the lender and each borrower.[19] Since this Court has concluded that the Respondent engaged in knowing misconduct, the remaining issue is the appropriate sanction.

### *Lawyer Sanction Standards*

Lawyer disciplinary sanctions "are not designed to be either punitive or penal."[20] "The objectives of the lawyer disciplinary system [in Delaware] are to protect the public, to protect the administration of justice, to preserve confidence in the legal profession, and to deter other lawyers from similar misconduct."[21] The focus of the lawyer disciplinary system in Delaware is not on the lawyer, but rather on "the danger to the public that is ascertainable from an attorney's record of professional misconduct."[22]

This Court has the exclusive authority for disciplining members of the Delaware Bar. Accordingly, we have stated that "while the Board's recommendation on the appropriate sanction is helpful to the court, it is not binding."[23] This Court "has wide latitude in determining the form of discipline, and ... will review the recommended sanction to ensure that it is appropriate, fair and consistent with ... prior disciplinary decisions."[24] Prior precedents reflect, *inter alia*, that this Court has cited, with approval, the ABA Standards.[25]

18. *See In re Davis*, 974 A.2d 170, 174 (Del. 2009).

19. *Id.* at 175.

20. *In re Garrett*, 835 A.2d 514, 515 (Del.2003).

21. *In re Bailey*, 821 A.2d 851, 866 (Del.2003).

22. *In re Hull*, 767 A.2d 197, 201 (Del.2001).

23. *In re Bailey*, 821 A.2d at 866.

24. *Id.*

25. *See, e.g., In re Barrett*, 630 A.2d 652, 656–57 (Del.1993); *In re Brewster*, 587 A.2d 1067, 1069–71 (Del.1991); *In re Higgins*, 582 A.2d 929, 932 (Del.1990); *In re Clyne*, 581 A.2d 1118, 1125–26 (Del.1990).

The ABA Standards includes the following provision:

**4.32 Suspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client.**

Commentary

Conflicts can take the form of a conflict between the lawyer and his or her client, between current clients, or between a former client and a present client. In the case of conflicts between a lawyer and a present client, suspension is appropriate when the lawyer knows that his or her interests may be or are likely to be adverse to that of the client, but does not fully disclose the conflict, and causes injury or potential injury to a client. For example, in *In re Boyer*, 295 Or. 624, 669 P.2d 326 (1983), the lawyer represented a client for a number of years, rendering both financial and legal advice. When another of his clients wanted to borrow money, the lawyer arranged for the first client to make a loan, and he prepared the note and a mortgage to secure the note, but the lawyer did not tell the first client either that such a loan might be usurious, and thus unenforceable, or that he had received a finder's fee from the second client for his efforts. The Oregon Supreme Court found that the lawyer violated DR5–101(A) in his representation of the first client, and suspended him for seven months. [Note: the court also found a violation of DR5–105(B).] Similarly, in *Joseph E. Chabat*, DP–161/80, DP 74/81 (Michigan Attorney Discipline Board, 1980), a lawyer in a divorce action was suspended for nine months when he lent himself money from the sale of a client's house and failed to advise the client to seek independent representation in regard to the loan.

Suspension is also appropriate when a lawyer knows of a conflict among several clients, but does not fully disclose the possible effect of the multiple representation, and causes injury or potential injury to one or more of the clients. For example, in *State v. Callahan*, 232 Kan. 136, 652 P.2d 708 (1982), the lawyer represented both the vendors and the purchaser in a land sale transaction. The lawyer failed to warn the vendors that they did not have a perfected security interest and failed to make full disclosure to the vendors of his close business and professional associations with the purchaser. The Supreme Court of Kansas imposed an indefinite suspension. Similarly, in *Matter of Krakauer*, 81 N.J. 32, 404 A.2d 1137 (1979), the New Jersey Supreme Court imposed a one-year suspension on a lawyer who represented both sides in a real estate transaction (and who also attempted to retain an unearned commission and called for a title search which was not ordered by the client).

■■■ ABA Standard 4.32 is directly applicable to the Respondent's ethical misconduct. The Respondent knew he had a concurrent conflict of interest. The Respondent made no effort to disclose that conflict to the lender and made untimely disclosures to the borrowers, or in the case of borrower Cross, no disclosure at all. The Respondent's concurrent conflict resulted in injury or potential injury to all clients. Accordingly, we conclude that a suspension is the appropriate action.

### Conclusion

Now, therefore, it is hereby ordered that:

1. The Respondent shall be prohibited and suspended from engaging in the prac-

tice of law for a period of three months for his violations of Rules 1.1, 1.4(b), 1.7, 1.16(a) and 1.16 Interpretive Guidelines Re: Residential real estate transactions. The suspension will commence on October 1, 2009, and end on December 31, 2009.

2. Beginning on January 1, 2010, the Respondent is placed on probation for a period of one (1) year, during which time the following conditions shall be imposed:

(a) Within the first 90 days of the probationary period, the Respondent shall attend a DSBA-sponsored or otherwise recognized CLE program directed to the ethical issue of conflicts of interest.

(b) The Respondent shall subject himself to, and cooperate with, conditions established by a practice monitor. The Respondent shall cooperate with the practice monitor to assure that the Respondent meets all obligations owed to clients under Rules 1.1, 1.7 and 1.16.

(c) The Respondent and his practice monitor shall provide a written report to the ODC every three months during the period of probation, confirming the Respondent's compliance with the terms of his probation and his level of adherence to his obligations under Rules 1.1, 1.4, 1.7 and 1.16.

(d) During the period of probation, the Respondent shall cooperate in the expedited handling of any subsequent disciplinary matters, with the understanding that any further violation of the Rules or any violation of the terms of the probation may be sufficient for reconsideration and escalation of the sanctions imposed; and

3. During the suspension, the Respondent shall conduct no act directly or indirectly constituting the practice of law, including the sharing or receipt of any legal fees. The Respondent shall also be prohibited from having any contact with clients or prospective clients or witnesses or prospective witnesses when acting as a paralegal, legal assistant, or law clerk under the supervision of a member of the Delaware Bar, or otherwise.

4. The Office of Disciplinary Counsel shall file a petition in the Court of Chancery for the appointment of a receiver for the Respondent's law practice.

5. The Respondent shall assist the Receiver in following the directives of Rules 21 and 23 of the Delaware Lawyers' Rules of Disciplinary Procedure.

6. The Respondent shall make such arrangements as may be necessary to protect the interests of any of the Respondent's clients.

7. The Respondent shall pay the costs of these disciplinary proceedings, pursuant to Rule 27 of the Delaware Lawyers' Rules of Disciplinary Procedure, promptly upon presentation of a statement of costs by the ODC.

8. The Respondent shall fully cooperate with the ODC in its efforts to monitor his compliance with this Opinion.

9. This Opinion shall be disseminated by the ODC in accordance with Rule 14 of the Delaware Lawyers' Rules of Disciplinary Procedure.